UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 05 B 52582 |
| JEFFREY F. OSCARSON, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| In re: | ) | |
| | ) | Case No. 05 B 52473 |
| OSCAR F. OSCARSON, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| GREEN BAY PACKAGING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 06 A 511 |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFREY F. OSCARSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| GREEN BAY PACKAGING, INC., | ) | |
| | ) | Adv. No. 06 A 525 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge Pamela S. Hollis |
| OSCAR F. OSCARSON, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This matter comes before the court on the adversary complaints filed by Green Bay

Packaging, Inc. against Jeffrey F. Oscarson ("Jeff") and Oscar F. Oscarson ("Fred"). Green Bay

seeks a finding that Jeff cannot discharge a debt owed to Green Bay pursuant to 11 U.S.C. §

523(a)(2)(B), and that Jeff's discharge should be denied pursuant to 11 U.S.C. § 727(a)(4).

Green Bay also seeks a finding that Fred cannot discharge his debt to Green Bay pursuant to 11

U.S.C. § 523(a)(2)(B). The court procedurally consolidated these adversary proceedings for

purposes of trial, and held the trial on both complaints on January 17 and 18, 2007. At the close

of Green Bay's case, the Oscarsons moved for a directed verdict. The court took the motion

under advisement, and the Oscarsons presented their case. Because there was some testimony

that Green Bay relied on the Oscarsons' financial statements, and because Jeff's bankruptcy

schedules contained some inaccuracies, the court denies the Oscarsons' motion for directed

verdict.

Nevertheless, for the reasons stated below, the court finds that as to both Fred and Jeff,

Green Bay has not met its burden of proof under § 523(a)(2)(B). Its claims against Fred and Jeff

are dischargeable. Additionally, Green Bay has not proven that Jeff's discharge should be

denied under § 727(a)(4). Judgment will be entered for the defendants on all counts.

## FINDINGS OF FACT

In or about 1968, Fred formed Midwest Packaging. Fred was a paper broker, and

through Midwest he acted as the middleman in transactions involving corrugated boxing and

packing materials. Midwest would accept orders from its customers, place the orders with a

supplier, and the supplier would ship the boxes directly to the customer by a method known as

drop shipment.

Jeff joined Midwest in 1995 as a salesman. Midwest was organized as a limited liability

company, and in or about 2000 Jeff bought 10% of Midwest from Fred. On August 20, 2003,

Jeff bought the remaining 90% membership right in Midwest Packaging and Fred later retired

from the business.

Green Bay was Midwest's primary supplier in the last several years. Green Bay's usual terms for payment were a 1% discount for payment in 10 days, and net due in 30 days. Green Bay allowed Midwest to pay invoices on more lenient terms because Green Bay believed that Midwest's customers took 90 days to make payments. By 1999 and 2000, however, Midwest's payment time started to approach 70 days.

## Green Bay Requests Financial Statements and a Guarantee From Fred and Jeff in 2000

No evidence was introduced to show when Green Bay first extended a line of credit to Midwest, but in 2000 the documented credit limit was $350,000. Robert Zingler, director of global credit services at Green Bay, testified that, with the exception of a general manager's ability to allow a customer to exceed its credit limit by 10%, he was the only person with authority to grant, increase or decrease that limit up to $5 million. Zingler never gave written authorization for Midwest's outstanding balance with Green Bay to exceed $350,000, and Midwest's credit was never formally increased past $350,000. Nevertheless, before Green Bay requested financial statements from Fred and Jeff in April, 2000, Midwest's outstanding balance to Green Bay exceeded $518,000. As of the late 1990's Zingler testified that Green Bay did no credit analysis of Midwest. This was because Green Bay had a longstanding relationship with Fred.

In year 2000, for the first time ever, Green Bay required Fred and Jeff to provide a guarantee of Midwest's obligations. Zingler testified that he determined that the guarantee was necessary because brokerage operations generally have few assets. And in fact, Jeff testified that he operated Midwest from an office in his basement. Midwest owned no real estate, equipment or inventory. The lack of assets combined with the slowing payment time and increasing obligation prompted Zingler to request the guarantee.

3

In combination with the guarantee, Zingler required Fred and Jeff to furnish Green Bay with personal financial statements. Zingler testified that he did not test the veracity of these statements. He did not request trade references or supporting documents such as income tax returns or bank statements. He took the financial statements for face value based on the Oscarsons' integrity and Fred's long relationship with Green Bay.

Midwest's documented credit limit remained virtually the same following receipt of the financial statements on or about April 12, 2000. The Oscarsons introduced into evidence the only three Line of Credit Change Notices executed by Green Bay for Midwest:

(1)     April 4, 2000, increasing Midwest's credit limit by adding a $25,000 credit limit from the folding carton division (before receipt of the financial statements);

(2)     April 12, 2000, no change on or about the time the financial statements were received; and

(3)     June 6, 2005, changing Midwest's terms of payment to cash only and instructing that no further product was to be shipped and no future orders were to be entered for Midwest.

On cross examination, Zingler testified that he never pulled any orders or stopped doing business with Midwest until right before Midwest closed down. He stated that his decision to pull the orders was based on late payment patterns, and not the financial statements. Zingler admitted that Midwest's debt to Green Bay was as high as $510,552.62 prior to the request for guarantees and financial statements. Moreover, Zingler did not change the credit line after he received the Oscarsons' financial statements.

On redirect, Zingler testified it was standard procedure to request a personal financial statement to accompany a guarantee. Although he stated that the guarantee and the financial statements influenced his decision to allow Midwest to continue to exceed its credit limit after

4

2000, his other comments lead the court to conclude that the financial statements were requested to merely "paper" or document the credit file   The bulk of the credit had already been extended to Midwest before the financial statements were requested.  Zingler concluded his redirect testimony by stating that payment history of customers determined credit limits.  Moreover, Zingler testified that Kevin Shields, employed in Green Bay's Franklin Park office, had discretion to increase Midwest's credit balance.  Mr. Shields was never presented as a witness, and accordingly, his rationale for allowing the balance to exceed the documented credit limit remains entirely unknown.

The court concludes that Midwest's credit balance was determined by the long positive business history with Fred, Midwest customer payment patterns, and Kevin Shields' unknown reasons, as opposed to the financial statements.  Indeed, if Zingler had received financial statements that reflected substantially less assets than were portrayed, and decided to pull the plug on Midwest, the balance owed in April of 2000 was almost as much as the final debt now owed to Green Bay.  The substantial balance prior to the financial statements is compelling evidence that Green Bay did not rely at all on the Oscarson's financial information to extend credit to Midwest.

Fred's Financial Statement

Fred completed his financial statement on April 10, 2000 (the "April Statement").  Fred testified that he filled out his financial statement by himself without any assistance, although he discussed his account balance with his banker "because I wanted it to have the correct amount." He estimated the real and personal property values and did not hire an appraiser.

In the April Statement, Fred stated that cash on hand and in financial institutions was $40,000. When asked to provide more specific information in Schedule A, Fred stated that he had $36,000 in a joint account with his wife at Charter Bank.

Green Bay introduced into evidence Fred's Charter Bank statement dated April 17, 2000. According to the bank statement, on the date Fred signed his financial statement his Charter Bank account actually had $24,000.74. During the month-long period covered by the statement, his balance declined from $26,473.85 to $23,762.70.

Fred also stated in his personal financial statement that he received income of dividends and interest in the amount of $45,000. Green Bay introduced into evidence Fred's 2000 tax return, which showed total taxable interest and dividends for 2000 as $519. In 1999, the figure was $1,553. The 2000 return also disclosed total gross income of $189,070 for 2000.

Fred testified that his accounts at Edward Jones were taxable, but he also testified that there was pension and retirement income in the accounts. According to his 2000 income tax return, Fred's total pension and annuities were $79,403, although the taxable amount was only $62,486. Fred's total Social Security benefits were $23,840, and again the taxable amount was only $20,264.

## Jeff's 2003 Financial Statement[1]

Meanwhile, Midwest's payment time continued to slow and by 2003 it was taking 75 to 90 days to pay invoices. As a result, Green Bay requested an updated financial statement from Jeff, which he furnished on July 1, 2003 (the "2003 Financial Statement"). See Exhibit 1. The balance Midwest owed to Green Bay on July 3, 2003 was $213,098.06. Zingler testified that

---

[1]    Midwest requested a financial statement from Jeff in 2000 but nearly all of the evidence taken concerned Jeff's 2003 financial statement.

6

although Green Bay had a long history of working with Fred, it had limited experience with Jeff.

He was an unknown quantity. Zingler did not request an updated financial statement from Fred.

In the 2003 Financial Statement, Jeff stated that cash on hand and in financial institutions

was $75,000. When asked to provide more specific information in Schedule A, Jeff stated that

he had $10,000 in a checking account and $35,000 in a savings account at Fifth Third Bank, both

held jointly with his wife, Laura Oscarson ("Laura").

Green Bay introduced into evidence Jeff's Fifth Third statement for the period from June

21 through July 21, 2003. See Exhibit 4. According to the bank statement, on the date Jeff

signed his financial statement his checking account actually had $11,305.69. However, the

balance in two savings accounts was approximately $3,324.95 and $219.80. Zingler testified

that if he had known there was so little cash it might have affected his decision to continue to

extend credit to Midwest.

Jeff also wrote in Schedule A that he had $30,000 in a savings account at Edward Jones.

Furthermore, in response to a question about government and listed securities, Jeff stated that he

had $200,000. When asked to provide more specific information in Schedule B, Jeff wrote that

the $200,000 was in a joint account at Edward Jones and held as mutual funds.

Green Bay introduced as Exhibit 5 a statement from Edward Jones for the period from

June 25 to July 25, 2003. According to the summary on the first page of the statement, Jeff or

Jeff and Laura held the following accounts at Edward Jones on the date of his financial

statement:

| Account Type | Value |
|---|---|
| Joint tenants with right of survivorship | $1,491.99 |
| Single account | $2.38 |
| Joint tenants with right of survivorship | $31,985.40 |
| Pension plan/separate account | $40,214.50 |
| Profit sharing/separate account | $70,114.35 |
| Individual retirement account | $25,305.34 |
| TOTAL | $169,113.97 |

Laura also held $8,837.38 in her individual retirement account.

Jeff testified that "anything I had at Edward Jones I called mutual funds, it was a mutual funds company. . . . I bulked it all together." The 2003 Financial Statement had a separate line item for "vested pension benefits or profit sharing." Jeff did not put any value for that line item. Zingler testified that it would have made a difference to him in his credit decision if he knew that most of Jeff's securities holdings were in pension plans or individual retirement accounts.

In his April 10, 2000 financial statement, Jeff stated that his homestead was worth $250,000. On or about January 23, 2002, Jeff and Laura transferred their house into tenancy by the entirety. In the 2003 Financial Statement, Jeff stated that his homestead was worth $350,000. The financial statement does not ask how the real estate is owned or whether it is exempt from individual creditors. Zingler testified that he did not know the house was held in tenancy by the entirety.

Jeff stated in his 2003 Financial Statement that the value of his automobiles, a 2003 Ford Expedition and a Honda Accord driven by Laura, was $40,000. Jeff did not list any secured debt for the cars. Zingler testified that if the cars were actually owned by Midwest and not by Jeff, it

8

would not have mattered very much because "$40,000 is not a lot in the scheme of things." He also testified that the fact that Jeff omitted his car loan did not matter very much.

Jeff stated in his 2003 Financial Statement on the line for "cash value life insurance" that he had a policy worth $100,000. However, the life insurance policy he described is actually a term policy with no cash value. Jeff testified that he included the policy because of "the face value of $100,000." In fact, in Schedule C there is a space for face amount, where Jeff wrote $100,000, and a space for cash surrender value, where Jeff wrote nothing. Zingler testified that if he knew the life insurance policy was actually a term policy, it would have impacted his credit decision because the policy appeared to contribute $100,000 to Jeff's net worth. If he found out that Jeff was in error, it might have led Zingler to doubt the integrity of the 2003 Financial Statement.

Jeff stated in the 2003 Financial Statement that his personal property was worth $750,000. The financial statement form did not ask for any detail regarding the personal property. According to a schedule Jeff later prepared for his Chapter 7 trustee Charles Myler, the biggest value included in his personal property was his interest in Midwest, valued at $621,621.00. See Exhibit 3.

Jeff stated in the 2003 Financial Statement that his salaries and bonuses were $200,000. According to his 2003 tax return, however, Jeff's adjusted gross income was $105,000. See Exhibit 8. Zingler testified that Jeff's salary should have been higher than $105,000 and if he knew that it were lower than $200,000 it would have led him to question Midwest's profitability.

Jeff's Schedules and Statement of Financial Affairs

Jeff filed his bankruptcy schedules and statement of financial affairs on October 13, 2005. He subsequently filed four amendments to the schedules. In response to Question 2 on

9

Schedule B, which asks debtors to list checking, savings or other financial accounts, Jeff listed only a checking account at Fifth Third Bank. None of the amendments changed this response.

Green Bay's Exhibit 19 is a group exhibit with multiple statements from Edward Jones, reflecting a joint account for Laura and Jeff, #233-08383-1-7. Two types of assets are shown on those statements, a cash and money market account held at Edward Jones, and a mutual fund account held outside Edward Jones. Jeff testified that he did not disclose account #233-08383-1-7 on his bankruptcy schedules. As of the date of Jeff's bankruptcy filing, the cash and money market account held approximately $16.31 and the mutual fund account contained approximately $2,600.00. Jeff testified that he disclosed the existence of this account to Myler and has offered the trustee a one-half interest in the account, including accrued postpetition interest.

On or about June 4, 2005, Laura wrote a check from the mutual fund account in the amount of $23,000 to cash with a notation for "vacation" on the memo line (the "Vacation Check"). See Exhibit 31. Laura deposited that check in a Statement Savings account held solely by her at Washington Mutual on or about June 6, 2005. See Exhibit 23. The $23,000 transaction was not disclosed in Jeff's Statement of Financial Affairs.

Laura wrote several checks from the Washington Mutual Platinum Checking account after the $23,000 deposit cleared. See Exhibit 24. Jeff testified that a number of these checks were written to his creditors. One of the checks was made out to John Kallman for $8,000. Kallman represented Midwest and Jeff in the federal court case brought by Green Bay. Laura was not named in the suit and she was not an employee of Midwest. Jeff testified that he asked Laura to write this check.

10

Several checks were written by Jeff from the Washington Mutual account, although they were signed by Laura. See Exhibit 26.

On June 2, Midwest wrote a check to Jeff in the amount of $23,000, and those funds were deposited into Jeff's Fifth Third account. See Exhibit 21. On or about June 3, 2005, Laura wrote a check from the "Classic Plus" account at Fifth Third in the amount of $20,000 to cash with a notation for "tax refund" on the memo line (the "Tax Refund Check"). See Exhibit 25. Laura deposited that check in her Washington Mutual Platinum Checking account on the same day. Jeff did not disclose the $20,000 check in his Statement of Financial Affairs. Myler has filed adversary proceeding number 06 A 1687 against Laura, seeking to recover the $20,000 on the theory that it was a fraudulent transfer.

Also on or about June 3, 2005, $2,500 and $9,000 were transferred in two separate transactions from Jeff and Laura's savings account at Fifth Third to their Classic Plus checking account. That same day, Laura wrote checks in the amount of $2,500 and $9,000 to cash from the Classic Plus account (collectively, the "College Checks"). See Exhibit 25. A notation on the memo line for the $9,000 check reads "college." Laura deposited those checks in her Washington Mutual Statement Savings account on the same day for an opening deposit in that account of $11,500.

On October 13, 2005, $15,000 was deposited into Laura's Platinum Checking account at Washington Mutual. $5,000 was withdrawn the same day. Jeff testified that he did not know the source of the funds for the $15,000 deposit.

Green Bay's Exhibit 17 is Midwest's check register. On May 3, 2005, Midwest wrote 3 checks in the amount of $1,750 to Jeff, which he then deposited into his Fifth Third account. On May 26, Midwest wrote 2 checks in the amount of $1,750 to Jeff. Although there was no

11

testimony that such withdrawals were a customary practice, Exhibit 17 shows that Midwest

regularly wrote checks to Jeff in the amount of $1,750, generally every two weeks but

sometimes more frequently.

Green Bay's Exhibit 20 is a group exhibit with multiple statements from Edward Jones,

reflecting a joint account for Laura and Jeff Oscarson, #233-05901-1-4. According to a March

2005 statement, the value of this account was $3,338.05 at that time. By June 2005, this account

was closed. Question 11 of the Statement of Financial Affairs asks a debtor to disclose "all

financial accounts and instruments held in the name of the debtor . . . which were closed, sold, or

otherwise transferred within one year immediately preceding the commencement of this case."

This account was not disclosed in the Statement of Financial Affairs.

Jeff scheduled his household goods and furnishings with a value of $1,000. See Exhibit

15. Green Bay introduced into evidence a copy of Jeff's personal articles insurance policy for

the period September 25, 2004 through September 25, 2005, where he insured jewelry, computer

equipment and classical instruments for over $26,000. See Exhibit 12. Jeff testified that he

valued his property for the bankruptcy schedules based on what he could expect to receive at a

garage sale. He also testified that he did not own the jewelry or the classical instruments.

Jeff did not schedule any liability to Fred that might still be due and owing under the

agreement by which Fred transferred his membership rights in Midwest to Jeff. As Jeff testified

at trial, he did not disclose those amounts "because he's my father."

Green Bay Stops Doing Business With Midwest

Fred sold his interest in Midwest to Jeff in 2003 and retired. By June 2005, Green Bay

cut off Midwest's credit, as its outstanding balance had grown to over $644,000. Green Bay had

never before held Midwest's orders and only did so once Midwest was paying invoices in the 90

12

to 120 day range. Zingler testified that he based his decision to hold Midwest's orders on

Midwest's payment patterns and how fast the invoices were getting paid.

Midwest closed its doors, although it never filed for relief under the Bankruptcy Code.

Both Fred and Jeff filed for relief under Chapter 7 on October 13, 2005.

## LEGAL DISCUSSION

The party seeking to establish an exception to the discharge of a debt bears the burden of

proof. In re Harasymiw, 895 F. 2nd 1170, 1172 (7th Cir. 1990). Therefore, Green Bay must prove

each element under § 523 by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279,

286 (1991). The discharge provisions of § 523 are construed strictly against the creditor and

liberally in favor of the debtor. In re Scarlata, 979 F. 2nd 521, 524 (7th Cir. 1992); In re

Zarzynski, 771 F. 2nd 304, 306 (7th Cir. 1985).

### 11 U.S.C. § 523(a)(2)(B)

    (a)      A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--; . . . .

    (2)      for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--

            (B)      use of a statement in writing-

                        (I)      that is materially false;

                        (ii)    respecting the debtor's or an insider's financial condition;

                        (iii)   on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

                        (iv)   that the debtor caused to be made or published with intent to deceive.

In order to succeed on its 523(a)(2)(B) claim, Green Bay must prove five elements: (1)

Fred and Jeff made statements in writing; (2) the statements were materially false; (3) the

statements concerned their financial condition; (4) in making the misrepresentations, Fred and Jeff intended to deceive Green Bay; and (5) Green Bay actually and reasonably relied upon the misrepresentations. In re Sheridan, 57 F. 3rd 627, 633 (7th Cir. 1995); In re Corrigan, 2003 WL 261919, *7 (Bankr. N.D. Ill. 2003) (citations omitted).

## Green Bay Has Not Proven That Fred's Debt is Nondischargeable Under § 523(a)(2)(B)

Green Bay is seeking to prove that Fred made two false statements on his personal financial statement: (1) the amount of cash in his Charter Bank account was $36,000; and (2) his dividend and interest income was $45,000. The complaint also alleged that Fred made false statements regarding the value of his personal property and the value of some non-residential real property. There was no testimony at trial regarding the real property, however, and in his closing argument, counsel for Green Bay did not address the personal property issue. Consequently, the court will focus only on Fred's statements regarding cash on hand and dividend/interest income.

Both of these statements were in writing and were made in respect to Fred's financial condition. However, Green Bay failed to prove that the statements, to the extent they were misrepresentations, either were material, or were made with the intent to deceive, or that Green Bay actually relied on the statements.

It is true that there was an approximately $12,000 difference in the Charter Bank account between the $36,000 Fred wrote on his financial statement and the approximately $24,000.74 that was in the account according to the bank statement. However, this misstatement was not material. During his testimony, Zingler was asked about the $40,000 value Jeff gave to his

14

automobiles. Zingler testified that this valuation did not matter because "$40,000 is not a lot in the scheme of things." Green Bay failed to prove that a $12,000 discrepancy was material.

The testimony regarding Fred's dividend and interest income was hopelessly muddled. However, Green Bay's line of questioning regarding the tax return was limited to Fred's Comparison Worksheet. Fred's actual 1040 provides significantly more information and demonstrates that any misstatement regarding dividend and interest income was not material.

Fred wrote in the April Statement that his total salary, dividend and interest income was $210,000. According to Fred's 1040, his total income for that year was $189,070. However, Fred received more than $20,000 in non-taxable pension, annuity and Social Security benefits which were not included in his total income. Therefore, even if Fred misstated the amount of income attributable to dividends and interest, his mistake was not material because his total income was approximately $210,000, which is exactly what he disclosed on the April Statement.

As for both the statements about cash on hand as well as divided and interest income, the court heard Fred's testimony and believes him to be a very credible witness. The court saw absolutely no evidence of intent to deceive, or of any attempt to mislead Green Bay. Fred testified that he wanted his financial statement to be absolutely true and correct, and his demeanor did not suggest otherwise.

Moreover, Green Bay has not proven that it actually relied on the values in the April Statement. Green Bay credit manager Joel Barta testified that the value of personal property was not particularly important because it was not a liquid asset. According to testimony from Green Bay's own witness, it did not particularly matter what Fred wrote down for a personal property value, because it would be difficult to liquidate that asset.

15

Additionally, Green Bay only held Midwest's orders and refused to extend additional credit when Midwest began paying invoices in the 90 to 120 day range. Zingler testified that he based his decision to hold Midwest's orders on Midwest's payment patterns and how fast the invoices were getting paid, not on the April Statement.

In fact, at the time Green Bay first requested the guarantee, Midwest's outstanding balance was over $518,000. In other words, Green Bay had already extended $518,000 worth of credit without the financial statements. Zingler testified that even with the financial statements he never raised Midwest's credit limit above $350,000.

Midwest's credit limit was $350,000 before Green Bay ever received the financial statements, and it remained at that level until Zingler cut off credit entirely. Although Midwest's balance eventually far exceeded that limit, Green Bay has not proven that was the result of reliance on the April Statement or the 2003 Financial Statement. Instead, the balance grew because the general manager of the Franklin Park facility, Kevin Shields, continued to allow Midwest to place orders on credit and to fall further and further behind on its accounts payable. There was no testimony suggesting that the manager had reviewed the financial statements. Zingler was the only Green Bay employee who reviewed the financial statements, and he kept the limit at $350,000.

Therefore, even though Midwest's balance eventually exceeded $644,000, Green Bay failed to prove that the debt was incurred as a result of Green Bay's reliance on the financial statements.

For all of these reasons, Green Bay has not meet its burden of proving each of the elements of § 523(a)(2)(B) and Fred's debt is dischargeable.

16

Green Bay Did Not Prove That Jeff's Debt is Nondischargeable Under § 523(a)(2)(B)

As the court discussed in the section above regarding Fred, Green Bay did not prove

actual reliance on the financial statements. Having failed to show actual reliance, Green Bay

cannot prevail on its § 523(a)(2)(B) count against Jeff. However, the court will address the

allegations Green Bay raised in order to highlight the other elements that it failed to prove.

First, Jeff stated that cash on hand and in financial institutions was $75,000: $10,000 in a

checking account and $35,000 in a savings account at Fifth Third Bank, as well as $30,000 in a

savings account at Edward Jones. Meanwhile, Jeff had less than $14,000 at Fifth Third. While

he had over $30,000 at Edward Jones, in response to a question about government and listed

securities, Jeff also stated that he had $200,000 at Edward Jones held as mutual funds. However,

Jeff's total holdings at Edward Jones were less than $170,000, including funds held in pension or

profit sharing accounts.

Jeff testified that "anything I had at Edward Jones I called mutual funds, it was a mutual

funds company. . . . I bulked it all together." The 2003 Financial Statement had a separate line

item for "vested pension benefits or profit sharing." Jeff did not put any value for that line item.

The statements regarding cash and securities that Jeff made in his 2003 Financial

Statement were false. While Jeff testified that the discrepancies were probably due to

fluctuations in account balances, the court does not find that testimony credible. The evidence

does not show that the balances would rise and fall as dramatically as Jeff suggests.

However, the court finds that Green Bay failed to prove that Jeff intended to deceive it

when making these false statements. After hearing Jeff's testimony, the court was left with the

definite and firm impression that he was somewhat careless, even negligent, in completing the

17

2003 Financial Statement. He testified that he believed what he wrote was the truth, and the

court has little trouble accepting the idea that Jeff did not keep a close eye on his account

balances. In hindsight, Jeff should have carefully reviewed his bank records before completing

the 2003 Financial Statement. That he failed to do so comes as no surprise and, based on

everything the court heard from Jeff, is not evidence of his intent to deceive. Although Fred

was able to successfully run Midwest for many years, Jeff ran Midwest into the ground in two

years. Jeff was not a sophisticated businessman. Compare In re Olbur, 314 B.R. 732, 746

(Bankr. N.D. Ill. 2004) (noting in the context of a § 727(a)(4) complaint that an inference of

fraudulent intent was warranted where debtor was "an intelligent, well-educated businessman,

someone acquainted with financial matters and undaunted by arid paperwork. He knew better.").

Indeed, Jeff's limited business ability probably resulted in Green Bay's ability to profit from Jeff

and Fred's business contacts after closing the doors on Midwest. The court heard testimony that

Green Bay continued to do business with Midwest's largest customer, Avon, without providing

any credit to Midwest for these direct sales. It appears that Jeff may have been careless in

matters that would have helped him as well as matters that hurt his creditors.

    In the 2003 Financial Statement, Jeff stated that his homestead was worth $350,000.

This reflects a $100,000 increase from Jeff's earlier financial statement, and does not disclose

that the house is now held in tenancy by the entirety. Jeff testified that the housing market in his

area at that time was very strong, and the court finds his testimony to be credible. Moreover, the

financial statement form does not ask how the real estate is owned or whether it is exempt from

individual creditors. Therefore, Green Bay did not prove that Jeff made any false statements

regarding his real property.

Jeff stated in his 2003 Financial Statement that the value of his automobiles, a 2003 Ford Expedition and a Honda Accord driven by Laura, was $40,000. Jeff did not list any secured debt for the cars. Zingler testified that if the cars were actually owned by Midwest and not by Jeff, it would not have mattered very much because "$40,000 is not a lot in the scheme of things." Green Bay failed to prove that any misstatements regarding the value of Jeff's vehicles was material.

Green Bay asserts that Jeff made a materially false statement when he represented that his personal property was worth $750,000. Whether or not the statement was false, Green Bay has not proven actual reliance on this statement. Barta testified for Green Bay that a prudent credit manager would not necessarily ask for an itemization of personal property because of the lack of liquidity. Since the personal property, especially the interest in Midwest, was not liquid, Green Bay put little if any actual and reasonable reliance on it. As Barta testified, putting a $621,000 value on Midwest 'would be a question mark but not a deal-stopper because the brokerage was not liquid.'

Green Bay alleges that Jeff made a materially false statement when he stated that he owned a life insurance policy with a cash surrender value of $100,000. Zingler testified that if he had learned that Jeff did not have such a policy, it would have impacted his credit decision, because the policy appeared to contribute $100,000 to Jeff's net worth.

However, even if Green Bay proved actual reliance, Zingler's reliance on the 2003 Financial Statement with regard to this policy was not reasonable. In Schedule C of the 2003 Financial Statement there is a space for face amount, where Jeff wrote $100,000, and a space for cash surrender value, where Jeff wrote nothing. Clearly Schedule C contradicted what Jeff wrote

19

on the first page of the 2003 Financial Statement, and should have at least raised a question about the value of the policy. Yet Zingler never asked Jeff to clarify how much life insurance he actually held and whether the policy had a cash surrender value or was merely a term policy.

The court is mindful that the Seventh Circuit has instructed us that a creditor need not "view each representation with incredulity requiring verification." Matter of Garman, 643 F. 2nd 1252, 1260 (7th Cir. 1980), cert. denied, 450 U.S. 910 (1981). However, in that same opinion the panel limited that statement by noting it applied "[a]bsent any facts reasonably indicating verification was necessary . . .". Id. See also Harasymiw, 895 F. 2nd at 1174 ("We do not sit as an after-the-fact loan committee, second-guessing lending decisions."). The 2003 Financial Statement was contradictory on its face, and a simple question to verify what sort of policy Jeff owned would have been appropriate in order to reasonably rely on it.

As for Jeff's salary, Zingler testified that if he knew the salary was lower than $200,000 it would have led him to question Midwest's profitability. However, Jeff was asked midway through the year what his annual salary would be. While Green Bay introduced evidence to show that Midwest's sales in 2003 were substantially lower than in 2002, the court has no information about Midwest's profitability and whether it was reasonable for Jeff to assume that his salary would be $200,000 despite the lower volume of sales. Proof that Midwest's sales declined is not proof that Jeff made a materially false statement regarding his salary.

Moreover, Jeff purchased the remaining 90% membership right in Midwest from Fred in 2003. So even if Midwest had lower sales than in previous years, he now owned 100% of the company and presumably was entitled to all of the profits. Green Bay did not prove that Jeff's

20

statement that his salary was $200,000, rather than the $105,000 he eventually reported on his tax return, was a materially false statement.

For all of these reasons, the court finds that Green Bay did not meet its burden of proving each of the elements of § 523(a)(2)(B) as to Jeff.

## 11 U.S.C. § 727(a)(4)(A)

Green Bay seeks a denial of Jeff's discharge pursuant to 11 U.S.C. § 727(a)(4). Section 727 is strictly construed against the objecting creditor and liberally in favor of the debtor, in order to protect the debtor's fresh start. In re Sapru, 127 B.R. 306, 314 (Bankr. E.D.N.Y. 1991). See also Fed. R. Bankr. P. 4005 ("At the trial on a complaint objecting to discharge, the plaintiff has the burden of proving the objection.").

In making a determination under § 727, the court must be mindful that one of the fundamental underpinnings of bankruptcy policy is the theory that "honest but unfortunate" debtors deserve a fresh start. Grogan, 498 U.S. at 287.

> If a creditor demonstrates by a preponderance of the evidence that the debtor actually intended to hinder, delay, or defraud a creditor, the court can deny the discharge. The intent to defraud must be actual and cannot be constructive; however, because it is unlikely that the debtor will admit fraud, intent may be established by circumstantial evidence.

Village of San Jose v. McWilliams, 284 F. 3rd 785, 790 (7th Cir. 2002) (discussing 727(a)(2)) (citations omitted).

According to 11 U.S.C. § 727(a)(4)(A),

(a)    The court shall grant the debtor a discharge, unless–; . . .

    (4)    the debtor knowingly and fraudulently, in or in connection with the case--

        (A)    made a false oath or account . . . .

21

For Jeff to be barred from discharge pursuant to 11 U.S.C. § 727(a)(4)(A), Green Bay

must prove by a preponderance of the evidence that: (1) Jeff made a statement under oath; (2)

the statement was false; (3) Jeff knew the statement was false; (4) Jeff made the statement with

the intent to deceive; and (5) the statement related materially to the bankruptcy case. In re Self,

325 B.R. 224, 245 (Bankr. N.D. Ill. 2005); In re Bailey, 147 B.R. 157, 162 (Bankr. N.D. Ill.

1992).

Green Bay's first argument is that Jeff's discharge should be denied because in his

Statement of Financial Affairs he failed to disclose three transfers to Laura: the Vacation Check,

the Tax Refund Check and the College Checks.

First, Green Bay must show that Jeff made a statement under oath. A debtor's

disclosures on his Statement of Financial Affairs are statements under oath for purposes of §

727(a)(4). Self, 325 B.R. at 246.

Next, Green Bay must demonstrate that Jeff's statement was false and that he knew it

was false.

> Whether a debtor made a false oath within the meaning of § 727(a)(4)(A) is a
> question of fact. A false oath may include a knowing and fraudulent omission. It
> is a debtor's role to carefully consider the questions posed and answer them
> accurately and completely.

Self, 325 B.R. at 245-246 (citations omitted).

Jeff argued at trial that he did not believe it was necessary to disclose these transfers to

Laura. Question 3 of the Statement of Financial Affairs asks a debtor to disclose "all payments

made within one year immediately preceding the commencement of this case to or for the benefit

of creditors who are or were insiders." Laura was not a creditor of Jeff's. See, e.g., Yacobian v.

22

Yacobian, 508 N.E. 2nd 1389, 1389 (Mass. App. Ct. 1987) ("A spouse in circumstances where divorce proceedings are 'imminent' may qualify as a creditor . . . [but m]arriage, alone, however, does not make a spouse a potential creditor" under Massachusetts law, which defines a creditor similarly to the Bankruptcy Code's definition in 11 U.S.C. § 101.)

Question 10 asks a debtor to disclose "all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case." Jeff testified that these transfers were made in the ordinary course of his financial affairs because "my wife is the one who is the bill person" in the family.

No evidence was introduced at trial that Jeff or Laura had ever previously made large cash withdrawals from their Edward Jones or Fifth Third accounts and deposited the funds in a separate account titled only in Laura's name. Laura has not filed for bankruptcy relief, so the court has no information about other accounts that may be in her name alone; we know only that she opened the Washington Mutual accounts four months before Jeff filed his case.

Nevertheless, having heard Jeff's testimony, the court finds credible his assertion that he did not believe that he was answering Question 10 falsely when he failed to list the transfers to Laura. In fact, Laura and not Jeff wrote the checks to cash, and she did so from accounts in which she held a joint interest.

Furthermore, the court finds that Green Bay has failed to prove that Jeff had fraudulent intent in failing to disclose these transfers. "Intent to defraud involves a material representation that you know to be false, or, what amounts to the same thing, an omission that you know will create an erroneous impression." In re Chavin, 150 F. 3rd 726, 728 (7th Cir. 1998). To find the

23

requisite degree of fraudulent intent, the court must find that Jeff knowingly intended to defraud or displayed a reckless disregard for the truth. Matter of Yonikus, 974 F. 2nd 901, 905 (7th Cir. 1992). Direct evidence of intent to defraud may not be available. In re Costello, 299 B.R. 882, 900 (Bankr. N.D. Ill. 2003). As a result, the requisite intent under § 727(a)(4)(A) may be inferred from circumstantial evidence or by inferences based on a course of conduct. Yonikus, 974 F. 2nd at 905. Reckless disregard means "not caring whether some representation is true or false . . . [and] is, at least for purposes of the provisions of the Bankruptcy Code governing discharge, the equivalent of knowing that the representation is false and material." Chavin, 150 F. 3rd at 728 (citations omitted).

Having heard Jeff testify for several hours, and having reviewed the evidence submitted by Green Bay, the court cannot find by a preponderance of the evidence that Jeff intended to deceive his creditors when he did not disclose these transfers in his Statement of Financial Affairs. Frankly, the court struggled with this issue. The transfers into Laura's account are questionable. And, while Laura was not a creditor of Jeff, Green Bay presented some evidence that some of the money transferred to Laura's account was use to pay Jeff's creditors. On the other hand, the money transferred to Laura was from an account owned by both Jeff and Laura. Ultimately, Jeff's clumsy attempts at prebankruptcy planning do not rise to the level of fraud required to invoke the harsh remedy of denying his discharge.

Moreover, it is important to keep in the forefront the true question presented to the court. It is not whether Jeff intended to defraud his creditors when Laura made three large cash withdrawals from their joint accounts and placed the money in her own name. The proper issue is whether Jeff's omission of these transfers from his Statement of Financial Affairs was done

24

with the intent to deceive his creditors or with reckless disregard for the truth. The court finds that the evidence does not support such a finding.

The court acknowledges that these transfers were material; in fact, Jeff's Chapter 7 trustee has filed an adversary proceeding against Laura, seeking to recover the $20,000 as a fraudulent transfer. "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." In re Chalik, 748 F. 2nd 616, 618 (11th Cir. 1984). However, materiality and a false statement are not enough; Green Bay had the uphill battle of proving intent to defraud, and this it failed to do.

Green Bay additionally submits that Jeff's discharge should be denied for his failure to disclose on his bankruptcy schedules the Edward Jones account which contained approximately $2,600 on the date of Jeff's bankruptcy filing. Failure to disclose this account was a false statement under oath. Although Jeff has advised his trustee of the existence of the account, he has not amended his bankruptcy schedules.

Again, the court is faced with the question of whether Green Bay has proven by a preponderance of the evidence that Jeff's failure to make a disclosure reflects fraudulent intent. The court finds that it does not. Jeff failed to itemize one account out of several, and this account contained less than $3,000. This omission does not rise to the level of deceit required to deny a debtor's discharge. While there "comes a point when the aggregate errors and omissions cross the line," In re Bostrom, 286 B.R. 352, 360 (Bankr. N.D. Ill. 2002), that point has not been reached here.

Green Bay further argues that Jeff's discharge should be denied because he scheduled his household goods and furnishings with a value of $1,000, while he insured jewelry, computer equipment and classical instruments for over $26,000 during the time period just before the filing. Jeff argued in his motion for directed verdict that Green Bay's assertions regarding the value of his personal property are untimely because property scheduled and claimed as exempt is exempt unless a party in interest timely objects. Fed. R. Bankr. P. 4003.

The court disagrees with Jeff's reasoning. Green Bay is not objecting to the exemption of personal property but has alleged that Jeff made a false oath in connection with his scheduling of the property. To impose a 30 day time limit on a discharge complaint when the value of personal property is implicated would be contrary to Fed. R. Bankr. P. 4004(a), which provides a deadline by which complaints objecting to the debtor's discharge must be filed.

However, Jeff testified that neither the jewelry nor the musical instrument belonged to him, but were owned by other family members. Moreover, the schedules required Jeff to provide the current market value of his property, not replacement value for insurance purposes. The court watched a video taken at Jeff's home depicting his household furnishings and property, which are owned jointly with Laura. Having seen the video and heard Jeff's testimony, the court finds that Jeff did not make a materially false oath with regard to the value of his personal property. There was nothing introduced into evidence indicating that Jeff's $1,000 estimate of the current market value of his property – owned jointly with Laura – was materially incorrect.     Presumably, had the trustee considered Jeff's household goods valuable, he would have sold them as soon as possible to avoid any further depreciation. Indeed, although Jeff's case has been pending for well over a year, trustee Myler did not sell or liquidate any of those household items. In contrast, he sold Jeff's Disney vacation points for $30,600, which Jeff

26

disclosed in his schedules valued at the amount of the actual sale. If Jeff intended to hide assets that had some meaningful value, those vacation points would have been much easier to conceal than the household items that were available for inspection and videotaping by Green Bay's attorneys. Yet, Jeff disclosed and accurately valued the vacation points.

Green Bay also asserts that Jeff's discharge should be denied for failure to disclose his interest in Laura's Washington Mutual accounts. Apparently Green Bay attributes Jeff's ownership interest to the fact that he wrote out several checks, which Laura signed. The court disagrees that Jeff has an interest in this account which he should have scheduled, or that failure to list the account was a false statement. Laura was the only signatory to the account, and the sole owner of the account. It was in her name. Jeff should not and properly did not include this account in his bankruptcy schedules.

Additionally, Jeff did not schedule any liability to Fred that might still be due and owing under the agreement by which Fred transferred his membership rights in Midwest to Jeff. Green Bay argues that this omission warrants denial of Jeff's discharge. Jeff testified at trial that he did not disclose these liabilities because Fred is his father. Although the amount owed to Fred was not insignificant, omitting his father as a creditor was not a material omission from Jeff's schedules. Fred has not attempted to collect the debt and has not filed a proof of claim, and based on the testimony given, the court believes that Fred will never do so. Of course, if Fred's claim had been scheduled, it would dilute Green Bay's share of Jeff's assets as liquidated by the trustee. If Jeff really possessed intent to minimize payment to his creditors, he would have listed liability to his father. Also, this court ventures to guess that had Fred's claim been scheduled, Green Bay would object to sharing pro rata with Fred. In conclusion, failing to list the liability to Fred is not sufficient to deny Jeff his discharge.

27

## CONCLUSION

For all of the reasons stated above, the court finds that Green Bay has not met its burden of proof under § 523(a)(2)(B) as to both Fred and Jeff, and has not proven that Jeff's discharge should be denied under § 727(a)(4). The Oscarsons' motion for directed verdict is denied, but judgment on the complaint will be entered for the defendants on all counts.

ENTERED:

Date:  MAR  8 2007

PAMELA S. HOLLIS
United States Bankruptcy Judge